UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

D'ANNA WELSH,

    Plaintiff,

v.                                          Case No:   2:21-cv-396-JLB-NPM

WILLIAM V. MARTINEZ,

    Defendant.
_____/

## ORDER

This case centers around a decade-long quest for Plaintiff D'Anna Welsh, to attempt to collect a $2,000,000 jury verdict against her ex-boyfriend, Defendant William Martinez, for violating her privacy by planting video and GPS surveillance to secretly view and track her without her knowledge.  Before the Court is Plaintiff's Motion for Summary Judgment (the "Motion").  (Doc. 58).  Defendant responded (Doc. 64) and Plaintiff filed a reply in support of the Motion (Doc. 65).

### BACKGROUND[1]

<u>The Connecticut trial court proceedings.</u>

More than a decade ago, Plaintiff, who is Defendant's ex-girlfriend, sued him

---

[1] Plaintiff included a Statement of Undisputed Material Facts in her Motion.  (*See* Doc. 58 at 2–13).  Defendant did not respond to the Statement of Undisputed Material Facts, but disputed some of the facts within his response.  With respect to facts that Defendant did not assert were genuinely disputed and/or did not object to, under Federal Rule of Civil Procedure 56(e), the Court may consider these facts undisputed for purposes of this motion and may grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that Plaintiff is entitled to it. Fed. R. Civ. P. 56(e)(2)–(3).

1

after he allegedly gave her a laptop with a spyware program on it, gave her gifts that secretly housed wireless spy cameras and were pointed towards her bed and shower, and installed a GPS tracking device in Plaintiff's vehicle without her knowledge.  *Welsh v. Martinez*, 157 Conn. App. 223, 226–27 (2015), *cert. denied*, 317 Conn. 922 (2015).  A jury returned a verdict in favor of Plaintiff on all counts and awarded her $2 million in damages.  *Id.* at 234; (Doc. 58-1 at 15–21).  The trial court denied Defendant's motion for remittitur.  *Welsh*, 157 Conn. App. at 240.  The Appellate Court of Connecticut affirmed the judgment.  *Id.* at 246.

On July 9, 2012, after Plaintiff filed her Motion to Prevent Defendant's Fraudulent Transfer of Property, in which she alleged that she had "a reasonable belief that [the] defendant will attempt to fraudulently transfer property in violation of [the Uniform Fraudulent Transfer Act]," the Connecticut court entered an order (the "Asset Standstill Order") that stated: "The Defendant William Martinez is enjoined from voluntarily transferring or encumbering any assets except business assets in the ordinary course of business and personal assets for ordinary living expenses."  *Welsh v. Martinez*, 191 Conn. App. 862, 867 (Conn. 2019); (Doc. 58-1 at 37).  On July 31, 2012, the Connecticut court entered an order (the "Asset Disclosure Order") stating: "Plaintiff is allowed to attach up to $2 million of the defendant's property and Defendant is to provide a disclosure of assets by August 10, 2012.  No wage garnishment to be sought at this time."  (Doc. 58-1 at 39); *Welsh*, 191 Conn. App. at 867.  And on June 24, 2013, the Connecticut court entered an additional order requiring the periodic disclosure of assets by

2

Defendant (the "Second Asset Disclosure Order"). *Welsh*, 191 Conn. App. at 867; (Doc. 58-1 at 78–81). Specifically, Defendant was required to "supplement and update his asset disclosure . . . every three (3) months . . . until further order of [the Connecticut trial court]." (Doc. 58-1 at 79).

In August 2017, the Connecticut court received "undisputed documentary and testimonial evidence" that, among other things, when Defendant's account at Farmington Bank was frozen in October 2012 as a result of collection actions undertaken by Plaintiff, Defendant began depositing his wages into an account with People's United Bank held solely by his then-wife, Cristina Martinez. *Welsh*, 191 Conn. App. at 868; (Doc. 58-1 at 45–46). The court found that he deposited $2,220,400.67 into that account between October 2012 and March 2016, making deposits on at least forty-six occasions. *Welsh*, 191 Conn. App. at 868; (Doc. 58-1 at 46). Defendant's version of events is that instead of garnishing Defendant's wages, Plaintiff garnished and froze Defendant's entire bank account and, after being told by his attorney that this course of action was acceptable, "[n]ot knowing what to do, [Defendant] transferred [his] wages to [his] wife's account so that [he] could pay [his] living expenses from them, including alimony and child support." (Doc. 64 at 4; Doc. 64-1 at 4).

The Connecticut court found that Defendant "made no effort to limit the use of his deposited wages to ordinary living expenses" and "[i]nstead, he directed expenditures to keep up a lavish lifestyle, including the purchase of diamond earrings, a David Yurman watch, trips to Jamaica, a trip to the Grand Canyon,

annual family trips to New York City, at least a partial payment for a BMW, country club membership dues, and dining out approximately five nights per week." (Doc. 58-1 at 52). The court found that this conduct constituted a series of willful violations of the Asset Standstill Order. *Welsh*, 191 Conn. App. at 869; (Doc. 58-1 at 52). The court further determined that because the entirety of his income was deposited to an account held in his then-wife's name alone, he was deemed to have knowingly and "voluntarily transferr[ed] or encumber[ed] his income (i.e., a personal asset) beyond what was necessary for ordinary living expenses, including court-ordered alimony and child support." *Welsh*, 191 Conn. App. at 870; (Doc. 58-1 at 53). Accordingly, in a November 2017 order (the "Contempt Order"), the court found him in civil contempt of the Asset Standstill Order and imposed a compensatory fine of $2.2 million payable directly to Plaintiff in an amount of $25,000 per month until the fine is paid in full. *Welsh*, 191 Conn. App. at 870; (Doc. 58-1 at 53, 56). In August 2019, the Connecticut appellate court reversed "only as to the order of damages" and remanded for a hearing on damages, but affirmed in all other respects. *Welsh*, 191 Conn. App. at 886.

Defendant claims that he paid Plaintiff $25,000 per month from the time of the November 2017 memorandum requiring him to make those payments until August 2019, after Defendant became unemployed and during the time that the Appellate Court had remanded the matter for a recalculation of damages. (Doc. 64-1 at 3–4).

On February 19, 2020, the Connecticut trial court found that the total

4

amount of Plaintiff's loss was $2,048,009.96 after deduction of Defendant's payments of $537,331.03 and ordered Defendant to pay Plaintiff a compensatory contempt fine of $25,000 per month until paid in full. (Doc. 58-1 at 73–76). In that order, the court noted that Defendant's only significant remaining assets were retirement accounts that may total $1.5 million. (*Id.* at 76).

Plaintiff alleges that Defendant failed to make his court-ordered $25,000 monthly contempt-fine payments to Plaintiff in January 2020, February 2020, and March 2020. (Doc. 58-1 at 4). In an August 14, 2020 order, a Connecticut trial court found:

> The court has previously ruled that the defendant had the ability to pay and that the court could consider the defendant's retirement accounts in making that determination. . . . After today's hearing, the court continues to believe that the defendant has the ability pay. The exhibits and the testimony of the defendant establish that the defendant has approximately $1 million in retirement funds. Further, over the past nine months, the defendant has liquidated approximately $216,000 in additional retirement funds, thus revealing the defendant's willingness to pay any applicable taxes and penalties and use funds that are nominally reserved for retirement.

(Doc. 58-1 at 86). The trial court further ordered Defendant to pay Plaintiff $25,000 by September 15, 2020 and by the fifteenth of each succeeding month. (*Id.*) The court noted that if Defendant failed to make that payment, he would be "incarcerated or otherwise confined for civil contempt" for the purpose of coercing payment from, not punishing him. (*Id.*) Defendant's affidavit states that he paid that $25,000 in September 2020. (Doc. 64-1 at 4).

Defendant's home purchases.

Plaintiff alleges that on March 4, 2020, Defendant transferred approximately $120,000 as a down payment on a house in Englewood, FL to his new wife, Kelly Rousseau. (Doc. 58 at 4). Defendant's testimony is that he made a payment of either $120,000 or $125,000 to buy a house between June 2020 and July 2021. (Doc. 58-1 at 248–49).

Defendant and his current wife also purchased a house in Naples in August 2020. (Doc. 58-1 at 89). Plaintiff claims that "Defendant admitted in his deposition that he supplied the entirety of the $140,000 in cash." (Doc. 58-1 at 6). Indeed, the purchase price of the Naples home was $620,000 (Doc. 58-1 at 89) and there was a mortgage of $480,000 on it (Doc. 58-1 at 92). Defendant's deposition testimony confirms that in August 2020, he bought another house which originally had a mortgage of $480,000. (Doc. 58-1 at 324). But then he paid down the mortgage by $380,000 to leave a mortgage of $100,000. (*Id.*) Defendant and his wife sold their home in Englewood on October 13, 2020. (Doc. 58-1 at 114). Defendant believes that he and his wife "lost money" on the sale of the Englewood home. (Doc. 58-1 at 326). The estimated $120,000 in equity in the Englewood home "went to taxes and buying the [Naples home]." (*Id.*)

Defendant's failure to file disclosure statements and make payments in accordance with Connecticut trial court orders.

Plaintiff alleges that from August 20, 2020 to August 19, 2021, Defendant failed to provide his mandatory quarterly asset disclosure statements. (Doc. 58-1 at 7). On December 23, 2020, the Connecticut trial court entered an order (the

6

"December 23, 2020 Order") finding that Defendant (i) failed to pay the $25,000 monthly fine in October, November, and December 2020; and (ii) failed, since August 2020, to provide a detailed asset and financial disclosure on a quarterly basis. (Doc. 58-1 at 117). The Court also found that Defendant had the ability to pay, based on his retirement accounts. (*Id.*) Accordingly, Defendant remained in contempt of court and the court indicated it would issue a capias for his arrest, identifying the following conditions of release: (i) posting of a $75,000 bond, cash, or surety; and (ii) provision of a current asset and financial statement. (*Id.*) In his deposition testimony, Defendant claimed that he signed quarterly asset disclosures other than in December 2020 because he "didn't know what [his] taxes were." (*Id.* at 175). Defendant also stated that he did not know who to send the quarterly reports to and seems to believe that he mailed the reports to either his attorneys or to Plaintiff's attorney. (*Id.* at 176–78). He also explains that he was not represented by counsel from some time in 2019 through the summer of 2021. (Doc. 58-1 at 180). Defendant did not post the $75,000 bond. (Doc. 58-1 at 282–83 ("Q[:] Why didn't you pay $75,000.00 to . . . purge the capias? . . . The answer is . . . you were confused? A[:] Correct.")).

    Defendant admits that he has withdrawn at least $600,000 from his retirement accounts since January 1, 2020. (*See* Doc. 32-1 at 91, ¶ 18 ("Admit that since January 1, 2020, you have withdrawn at least $600,000 from your retirement accounts and used the money for reasons other than to pay Plaintiff"); Doc. 32-1 at 97, ¶ 18 ("Admit.")). Since October 1, 2020 through at least August 2, 2021,

Defendant admits that he did not pay Plaintiff any money from any of the retirement accounts. (Doc. 32-1 at 91, ¶ 25 ("Admit you failed to pay Plaintiff any of your money in the bank since October 1, 2020"); Doc. 32-1 at 97, ¶ 25 ("Admit.")). Plaintiff's affidavit states that she received no payments through September 2022. (Doc. 58-1 at 9). Defendant does not appear to dispute this statement.

Defendant has further admitted that he has not paid bills "since a long time." (Doc. 58-1 at 254). According to Defendant, his wife pays their mortgage via an automatic debit from her account. (*Id.* at 269).

Defendant's employment history.

Defendant states that he and his wife moved to Florida, in part, because he could not find employment in Connecticut and thought he would have a better chance in Florida. (Doc. 64-1 at 2). He states that prior to obtaining full-time employment, as detailed below, "Plaintiff made finding work virtually impossible." (*Id.*) Defendant explained that there are two articles that come up when his name is searched, one of which is on the website of Plaintiff's Connecticut counsel. (*Id.*) Defendant hired a "link removal" firm in an effort to prevent these articles from showing up in an internet search, but Plaintiff's counsel would have to agree to the "de-linking" of his name to the article and has refused to do so. (*Id.*) Defendant further explained that when he first became unemployed in 2019, he was contacted by another local hospital wishing to hire him, but the hospital "suddenly changed its mind" and the same order of events happened again at two other hospitals. (*Id.*) He stated, "I heard that Plaintiff had told a cardiac surgery physician assistant that

8

she would make sure that [he] never work[s] again." (*Id.*)

From November 2, 2021 through February 28, 2022, Defendant became employed as a cardiac surgeon earning $1,300.00 gross salary per day, working an average of three to four days per week. (Doc. 58-1 at 123). Since March 1, 2022, Defendant has been employed full-time at Riverview Cardiac Surgery in Bradenton, Florida. (*Id.*) Depending on which hospitals Defendant maintains privileges to work, per his Employment Agreement with Riverview Cardiac Surgery, Defendant earns an "Annual Base Salary" of either $250,000 or $300,000 per year payable in equal installments of $20,833.33 or $25,000.00 per month. (Doc. 58-1 at 127–28). Defendant can earn additional compensation of 25% of collections from services he performs and, under certain circumstances after two years of employment, Defendant will be able to earn 30% of collections. (Doc. 58-1 at 128). From November 2021 through July 2022, Defendant received net paychecks from his employer totaling $164,599.55. (Doc. 58-1 at 111). Defendant states that "although [he] ha[s] retained full-time employment, Plaintiff's counsel has contacted [his] place of employment, to the extent that [his] employer reached out to [him] to inform [him] of this." (Doc. 64-1 at 3). He also states that it is his understanding that his employer has been subpoenaed for deposition and documents, and he is "constantly stressed that [he] may be fired . . . due to Plaintiff's conduct." (Doc. 64-1 at 2–3).

Florida State Law Proceedings

Plaintiff's affidavit states that she recorded the December 23, 2020 order in

9

the office of the clerk of the circuit court of Collier County. (Doc. 58-1 at 9). According to Plaintiff, Defendant did not object to the enforceability of the December 23, 2020 order within 30 days. (Doc. 58-1 at 9). On March 16, 2021, the Clerk of Court in Collier County filed a Notice of Recording Foreign Judgment, which indicated that it was mailed to Mr. Martinez at his Naples address on February 10, 2021. (Doc. 58-1 at 119).

On December 3, 2021, the Collier County Circuit Court magistrate entered an order recommending granting Defendant's claim of exemption, stating "Defendant's Individual Retirement Account ending in -9322 held by garnishee Charles Schwab & Co., Inc. is exempt from Plaintiff's judgment pursuant to § 222.21(2)(a)(2), *Florida Statutes*." (Doc. 64-1 at 74). It further stated that "[w]hile Defendant's Individual Retirement Account can be considered in determining Defendant's ability to pay a contempt fine, it is still exempt from garnishment pursuant to § 222.21(2)(a)(2)." (*Id.*) The Circuit Court judge approved the recommended order on February 22, 2022. (Doc. 64-1 at 72). At the hearing on the claim of exemption, which took place on November 16, 2021, the Collier County Circuit Court judge stated:

> First of all, there's a problem with what you're trying to do in terms of the order. I agree – and you even admitted it – that this is not a final order, because you just admitted that he could go ask to have it modified. So you domesticated the wrong judgment. You didn't domesticate a final order, number one.
>
> Number two, . . . [t]here's no finalizing execution language. And as we all learned in law school, you've got to have that or you can't execute, by any means, let alone garnishment.

> Number three, it's only for $75,000. We're not talking about the whole judgment here. So . . . the problem on the get-go is what you are trying to domesticate and, therefore, enforce.
>
> The second problem is the method you're trying to use. . . . As I said, there are some very, very limited circumstances that you can garnish retirement accounts, but that's only sort of if somebody is taking money out, and you can issue a continuing garnishment. . . .
>
> [I]f the case was set up properly, either here or in Connecticut such that he could be arrested and held in jail until he paid, the fact that he had IRA and retirement accounts could be considered in terms of, well, you have the ability to pay, so we're going to keep you in jail until you pay. But he cannot be actually attached, at least not in this context, and garnished.

(Doc. 64-1 at 102–03).

## LEGAL STANDARD

Summary judgment is appropriate when the movant can show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A district court must grant a motion for summary judgment only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Essex Ins. Co. v. Barrett Moving & Storage, Inc.*, 885 F.3d 1292, 1299 (11th Cir. 2018).

An issue is "genuine" if a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the nonmoving party in light of his burden

of proof. *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014). And a fact is "material" if under the applicable law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004).

## DISCUSSION

I.  <u>Whether the December 23, 2020 Contempt Order is enforceable in Florida.</u>

Count One requests enforcement and contempt for violation of the December 23, 2020 Order. (Doc. 1 at ¶¶ 67–83). Defendant argues that the Connecticut orders are unenforceable in Florida because they are subject to modification and because they do not contain language which would permit execution. (Doc. 64 at 10–12).

Article IV, section 1 of the U.S. Constitution provides: "Full faith and credit shall be given in each State to the public acts, records, and judicial proceeding of every other State. And the Congress may by general laws prescribe the manner in which such acts, records and proceedings shall be provided, and the effect thereof." And 28 U.S.C. § 1738 provides, in pertinent part:

> The records and judicial proceedings of any court of any . . . State . . . shall be proved or admitted in other courts within the United States . . . by the attestation of the clerk and seal of the court annexed, if a seal exists, together with a certificate of a judge of the court that the said attestation is in proper form.
>
> Such . . . judicial proceedings . . . so authenticated, shall have the same full faith and credit in every court within the United States.

Florida's Enforcement of Foreign Judgments Act (FEFJA) allows a creditor to domesticate a "foreign judgment" without filing a lawsuit. *Welsh v. Martinez*, 350

So. 3d 811, 813 (Fla. 2d DCA 2022) (citing *Fazzini v. Davis*, 98 So. 3d 98, 102 (Fla. 2d DCA 2012)). "Foreign judgment" is defined as "a judgment decree, or order of a court of any other state . . . if such judgment, decree, or order is entitled to full faith and credit in this state." *Id.* (citing Fla. Stat. § 55.502(1)). "When a foreign judgment is domesticated, it becomes enforceable as a Florida judgment." *Fazzini*, 98 So. 3d at 102.

Orders that are "nonfinal and modifiable," however, are not entitled to full faith and credit. *Welsh*, 350 So. 2d at 813 (citing *West v. West*, 301 So. 2d 823, 826–27 (Fla. 2d DCA 1974)). This Court determines the finality of these orders under the laws of the foreign state of Connecticut. *Id.* (citing *Turner v. Temple*, 625 So. 2d 101, 101 (Fla. 2d DCA 1993)).

Here, the Florida Second District Court of Appeal found that section 52-400d, Connecticut General Statutes, is determinative on the issue of finality. *Id.* at 814. Section 52-400d(a) provides: "Any court decision on a determination of interest in property under section 52-356c, or on an exemption claim, <u>or on a contempt proceeding</u>, or on any stay ordered pursuant to an installment payment order, <u>shall be a final decision for the purpose of appeal</u>." *Id.* (citing Conn. Gen. Stat. § 52-400d(a)) (emphasis added). The Second District Court of Appeal also found that "Connecticut courts recognize contempt proceedings as separate distinct proceedings" and that the December 23, 2020 Order is an order that "terminates a separate distinct proceeding." *Id.* (citing *State v. Curcio*, 191 Conn. 27 (1983)).

This Court agrees with Judge Smith's analysis in *Welsh*. The *Welsh* court

13

noted that it was not persuaded by Defendant's argument that the order is nonfinal simply because the Connecticut court may later modify the order. *Welsh*, 350 So. 3d at 814. This Court agrees on that point as well. *See Khan v. Hillyer*, 306 Conn. 205, 49 A.3d 996, 1001–02 (2012) (where defendant claimed that contempt order was not final, court stated that "a civil contempt order requiring the contemnor to incur a cost or take specific action . . . constitutes an appealable final judgment").

Defendant's argument that the December 23, 2020 Order does not include the language "for which let execution now issue" (Doc. 64 at 11–12) is equally unavailing. The Second District Court of Appeal has previously found that "the language 'for which let execution issue' is not essential to the finality of a judgment." *Getman v. Tracey Const., Inc.*, 62 So. 3d 1289, 1291 (Fla. 2d DCA 2011) (quoting *City of Haines City v. Allen*, 549 So. 2d 678, 278 (Fla. 2d DCA 1989)); *see also Fiddler's Creek, LLC v. Naples Lending Grp., LC*, No. 2:14-379-FtM-PAM-CM, 2018 WL 1128173, at *3 (M.D. Fla. 2018) ("[T]he Court agrees with those decisions determining that the words 'for which let execution issue forthwith' is both archaic and inessential."). Defendant cites no case law indicating that a judgment cannot be domesticated without the proper execution language. Accordingly, the Court finds that the December 23, 2020 Order is entitled to full faith and credit under FEFJA. Thus, summary judgment as to Count One is **GRANTED in part** only to the extent that the Court will grant full faith and credit to the December 23, 2020 Order and otherwise **DENIED in part** without prejudice. Should Plaintiff desire that the Court take specific action with respect to enforcement of the December 23,

14

2020 Order, Plaintiff must request such action via separate motion after the evidentiary hearing indicated below.

    II.    <u>Whether the other Connecticut state court orders are enforceable by this Court.</u>

Counts Two, Three, Four, and Five request enforcement of various other orders. (Doc. 1 at ¶¶ 84–127). But neither Plaintiff nor Defendant provided any legal argument as to why such orders are or are not entitled to full faith and credit. In a conclusory fashion, Plaintiff states that each order is "an enforceable final order entitled to full faith and credit." (Doc. 48 at 21–24). This "argument" is not persuasive. Defendant, for his part, summarily states, without going into any detail about each order, that the orders are subject to modification and are not final. (*See* Doc. 64 at 10).

At this juncture, summary judgment is **DENIED** on Counts Two, Three, Four, and Five. The Court will, however, deny summary judgment without prejudice to allow Plaintiff to re-file its motion for summary as to these counts, with appropriate arguments about why such orders are enforceable, with pinpoint citations to the record in support.

Count Six requests a declaratory judgment that "all court orders issued by the Superior Court of Connecticut" in the Connecticut case "are in full force and effect." (Doc. 1 at ¶¶ 128–34). Summary judgment as to Count Six is **GRANTED in part** as to the December 23, 2020 Order, and **DENIED in part** as to the orders enumerated in Counts Two, Three, Four, and Five.

    III.    <u>Whether this Court should issue a writ of bodily attachment for Defendant's arrest with the same conditions as the December 23, 2020 capias.</u>

Count Seven requests the issuance of a writ of bodily attachment and setting of a bond. (Doc. 1 at ¶¶ 135–138). The Court denies summary judgment as to Count Seven because there is a genuine issue of material fact as to whether Defendant has the present ability to purge himself of contempt.

As Defendant points out, "incarceration cannot be imposed upon a civil contemnor for willfully failing to comply with a court order unless the court first determines that the contemnor has the present ability to purge himself of contempt." *Bowen v. Bowen*, 471 So. 2d 1274, 1278 (Fla. 1985). "Because incarceration is utilized solely to obtain compliance, it must be used only when the contemnor has the ability to comply. This ability to comply is the contemnor's 'key to his cell.'" *Id.* at 1277; *see also Bajcar v. Bajcar*, 247 So. 3d 613, 617 (Fla. 3d DCA 2018) ("While civil contempt may, under appropriate circumstances, result in incarceration of the contemnor, incarceration is not the ultimate goal; it is merely a means to an end."). In other words, incarceration is not meant to be used as punishment, but rather as a tool for enforcement. *Bowen*, 471 So. 2d at 1277 ("Because incarceration is utilized solely to obtain compliance, it must be used only when the contemnor has the ability to comply.").

Plaintiff points out that Dr. Martinez has an employment agreement entitling him to up to $300,000 per year base salary and additional compensation of 25% of collections from services he performs. (Doc. 58-1 at 127–28). Notwithstanding, the Court does not have enough information ***at this time*** about

Defendant's present ability to pay to rule on this matter or to otherwise enforce any contempt order. *See Voigt v. Voigt*, 505 So. 2d 626, 626 (Fla. 3d DCA 1987) (trial court erred in holding wife in contempt for refusing to return certain items belonging to husband without conducting an evidentiary hearing to determine wife's present ability to comply with the court's order) (citing *Bowen*, 471 So. 2d at 1274). Accordingly, Plaintiff's Motion for Summary Judgment is **DENIED** as to Count Seven and the Magistrate Judge shall hold an evidentiary hearing as to whether Defendant has the present ability to purge the contempt.

*-Remainder of page intentionally left blank-*

## CONCLUSION

For the foregoing reasons, it is now **ORDERED**:

1. Plaintiff's motion for summary judgment is **GRANTED in part** and **DENIED in part**, as set forth above.

2. No later than August 7, 2023, Plaintiff may file an amended motion for summary judgment as to Counts Two, Three, Four, and Five, with appropriate arguments about why such orders are enforceable, with pinpoint citations to the record. Defendant may file his response in accordance with Middle District of Florida Local Rule 3.01(c) and Plaintiff may file a reply in support of the amended motion in accordance with Local Rule 3.01(d).

3. The Magistrate Judge shall hold an evidentiary hearing as to whether Defendant has the present ability to pay the funds in the December 23, 2020 order noted above.

4. Within seven (7) days of the date of this Order, the parties shall advise all state courts where *any* related litigation involving the collection of *any* funds from Defendant by Plaintiff is pending by providing the court(s) a copy of this Order.

**ORDERED** at Fort Myers, Florida on July 17, 2023.

JOHN L. BADALAMENTI
UNITED STATES DISTRICT JUDGE